IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

F I L E D

AUG 1 1 2011

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

BAHMAN NESARI,                        )
                                      )
          Petitioner,                 )
                                      )
     v.                               )    1:11cv19 (LMB/IDD)
                                      )
SARAH TAYLOR, *District Director*     )
*of USCIS*, et al.,                   )
                                      )
          Defendants.                 )

## MEMORANDUM OPINION

Before the Court are the parties' Cross-Motions for Summary
Judgment [Dkt. Nos. 41 and 59], along with the petitioner's Motion
for Voluntary Dismissal pursuant to Fed. R. Civ. P. 41(a)(2) [Dkt.
No. 66].  For the reasons stated below, petitioner's motions [Dkt.
Nos. 59 and 66] will be denied, defendants' motion [Dkt. No. 41]
will be granted, and judgment will be entered in favor of the
defendants.

## I. Background

Petitioner Bahman Nesari ("Nesari"), a native and citizen of
Iran, brings this civil action seeking de novo judicial review of
the denial of his application for naturalization, pursuant to 8
U.S.C. § 1421(c).  Specifically, Nesari is suing Sarah Taylor,
District Director of the Washington District Office of the United
States Citizenship and Immigration Services ("USCIS"); Alejandro
Mayorkas, Director of USCIS; Michael Aytes, Acting Deputy Director
of USCIS; Janet Napolitano, Secretary of the United States

Department of Homeland Security ("DHS"); and Eric J. Holder, Attorney General of the United States Department of Justice (collectively "defendants"), contending that the decision by the USCIS denying his application for naturalization was incorrect. See Pl.'s Compl. ¶¶ 53-62.  He further contends that he meets all of the statutory requirements for naturalization under 8 U.S.C. § 1427, and that he is therefore entitled to become a naturalized United States citizen.  See id. ¶ 54.

Defendants, however, argue that Nesari is statutorily ineligible for naturalization as a United States citizen as a matter of law for two reasons: first, because he was not lawfully admitted into the United States, and second, because he cannot establish good moral character under the Immigration and Nationality Act ("INA").  See Mem. of Law in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Mot. for Summ. J.") at 2.  In particular, defendants allege that Nesari entered the United States on a K-1 fiancé visa issued to him in error, and that he was never lawfully admitted into the United States because he never met his fiancée in person before entering the country, as is required by 8 U.S.C. § 1184(d)(1), nor did he ever obtain a valid waiver of that meeting requirement.  Id. at 23-27.  Defendants also allege that Nesari provided false testimony under oath in his naturalization proceedings in an attempt to obtain immigration benefits, and that he therefore cannot establish that he is a person of good moral character.  Id. at 27-30.

Defendants have accordingly filed the instant Motion for Summary Judgment [Dkt. No. 41], asking the Court to grant summary judgment in their favor as a matter of law under Fed. R. Civ. P. 56. Nesari also filed his own Cross-Motion for Summary Judgment [Dkt. No. 59] on July 12, 2011, and then filed a Motion for Voluntary Dismissal [Dkt. No. 66] on July 21, 2011. This Memorandum Opinion will conclusively resolve all pending motions.

A. K-1 Fiancé Visa

On or about March 1, 1996,[1] United States citizen Jessica Eastin ("Eastin"),[2] filed a Form I-129F Petition for Alien Fiancé on behalf of Nesari. See Pl.'s Compl. ¶ 17; see also Admin. Record ("A.R.") at 300. In response to question 19 on the I-129F Petition, which asks whether "[y]our fiancé(e) has met and seen you," Eastin disclosed that she had never met Nesari, explaining that they had communicated via letter correspondence, but that she had never met him in person because it was "very dangerous for me to travel to Iran," and because "since 1989 my fiancé [Nesari] has been prohibited from traveling outside of Iran because of strict Iranian military regulations." Id. at 301, 313. She further represented that "He [Nesari] . . . will end his mandatory [military] service on or soon after February 7, 1996," id. at 313,

---

[1] Although the I-129F Petition appears to have been signed by Eastin on January 29, 1996, it was not filed until on or about March 1, 1996.

[2] Eastin also apparently goes by the name "Marijane Star." See Dkt. No. 65.

but she provided no additional information regarding why the two
had not planned to meet in person at the conclusion of Nesari's
military obligations.  Eastin also provided no details regarding
how she and Nesari were introduced, or how their relationship had
developed in light of the fact that the two had never met in
person.  See id.

On or about March 8, 1996, the former Immigration and
Naturalization Service ("INS")[3] issued Eastin a Notice of Action
requesting additional information regarding the nature of her
relationship with Nesari, and seeking proof that they had met in
person in the preceding two years, as is required under 8 U.S.C.
§ 1184(d)(1) and 8 C.F.R. § 214.2(k)(2).  See id. at 2681.  The
INS's Notice specifically queried why Eastin and Nesari had not
met at some point after February 7, 1996, the date that Eastin
alleged that Nesari's military service had concluded.  Id. at
2682.  Moreover, in response to Eastin's assertion that it was
dangerous for her to travel to Iran, the INS asked why the two had
not met in a neutral third country, as do many United States
citizens who are engaged to Iranians.  Id.  The agency further
inquired, among other things, how Eastin and Nesari became
acquainted, and how the two became acquainted with one another

---

[3] As of March 1, 2003, the former INS ceased to exist as an
independent agency within the Department of Justice, and its
adjudicatory functions were transferred to the newly formed
USCIS.  See Homeland Security Act of 2002, Pub. L. No. 107-296,
§§ 441, 451, 471, 116 Stat. 2135 (Nov. 25, 2002).

4

well enough to want to be married, despite never having met in person.  Id.  In conclusion, the INS advised Eastin: "You have submitted no evidence of any relationship at all, much less one strong enough to result in marriage.  Please submit evidence of your relationship."  Id.

By a letter dated May 31, 1996, Eastin responded to the INS's Notice.  See A.R. at 1927.  In that letter, Eastin did not request an exemption from the in-person meeting requirement, but instead stated that:

[] It has NOT been possible for us [Eastin and Nesari] to meet in a third country due to passport and other related arrangements that my fiancé had to make in Iran before being allowed to depart Iran.  Those arrangements have only now been completed and [Nesari] is now able to depart Iran.

[] July is the earliest possible time for us to meet in a third country.  Enclosed please find a copy of my ticket for departing the U.S. to travel to Turkey in July 1996 in order to meet my fiancé.

[] Upon my return [from Turkey] requested documents will be submitted to your office.

Id.  As proof of her purported intention to meet Nesari, Eastin enclosed copies of United Airlines airplane tickets issued in her name for round trip travel departing from Washington, Dulles International airport to Istanbul, Turkey on July 1, 1996.  Id. at 1928-32.  However, petitioner concedes that Eastin never actually used those tickets, and that she never traveled to Turkey, or any other location, to meet Nesari in person before Nesari came to the United States.  See Pl.'s Compl. ¶ 20; see also

5

A.R. at 1874 (statement from Eastin admitting that she never traveled to meet Nesari).

Instead, on June 5, 1996, before Eastin was purportedly scheduled to travel to Turkey to meet Nesari, the INS, in an apparent administrative error, approved Eastin's I-129F Petition for Alien Fiancé visa on behalf of Nesari. See A.R. at 300, 1988. Nesari was accordingly issued a K-1 fiancé visa[4] by the United States Consulate in Ankara, Turkey, and he entered the United States on that visa on August 8, 1996. See A.R. at 54. Nesari, however, did not meet Eastin until several months later, in late October 1996, when Eastin came from New Mexico (where she lived) to Lansing, Michigan (where Nesari was living with his brother, Yousof "Joe" Nesari) to meet Nesari in person. Id. A week or two later, on November 2, 1996, Eastin and Nesari were married. See Pl.'s Compl. ¶ 22; see also A.R. at 1114, 1989 (Marriage License).

## B. Permanent Resident Application and Petition to Remove Conditions

On or about December 20, 1996, Nesari then filed a Form I-485 Application to Register Permanent Residence or Adjust Status based

---

[4] The K-1 visa, which is issued to an alien upon approval of an I-129F Petition, allows the alien fiancé/fiancée who lives outside the United States to travel to the United States to marry the citizen fiancé/fiancée. See 8 C.F.R. § 214.2(k). The K-1 visa is granted based on the premise that the holder will come to the United States on a temporary basis to complete a specific purpose: in this case, to marry the sponsoring United States citizen. Id. If the K-1 visa holder marries the U.S. citizen within 90 days, the K-1 holder may apply for an adjustment of status and become a permanent resident upon approval of the adjustment of status. See 8 U.S.C. § 1255(d).

6

upon his status as the spouse of a United States citizen.  See
A.R. at 194.  Nesari and Eastin were interviewed regarding that
application in June 1997, and on April 8, 1998, the INS granted
Nesari permanent resident status on a conditional basis, pursuant
to 8 U.S.C. § 1186a and INA § 216.[5]  See id. at 1006.  Less than
two years later, on March 30, 2000, Nesari and Eastin officially
divorced.  See id. at 565.

On April 24, 2000, Nesari, by and through counsel, filed a
Form I-175 Petition to Remove Conditions on Residence.  Id. at
524.  To remove the conditions established under 8 U.S.C.
§ 1186a, the alien spouse and the petitioning spouse (if not
deceased) must submit to the Attorney General a joint petition
requesting the removal of such conditions.  See 8 U.S.C.
§ 1186a(c).  In his I-175 Petition, Nesari requested, inter alia,
that he be granted a waiver of the requirement that the petition
be filed jointly with his United States citizen spouse.  As
grounds for that requested waiver, Nesari contended that he and
Eastin had "entered into the marriage in good faith, but the
marriage was terminated through divorce."  A.R. at 532.

---

[5]   The Immigration and Naturalization Act provides, in
pertinent part, that "an alien spouse . . . shall be considered,
at the time of obtaining the status of an alien lawfully admitted
for permanent residence, to have obtained such status on a
conditional basis subject to the provisions of this section."  8
U.S.C. § 1186a; see also INA § 216.  In other words, if an alien
is the spouse of a United States citizen or a permanent resident
and the marriage occurred less than two years before the alien
spouse is admitted as a permanent resident, then the permanent
residence status is conditional.

7

On July 3, 2002, the INS issued Nesari a Notice of Intent to Deny his Form I-751 Petition. See id. at 1062. The Notice advised Nesari that based on a careful review of the record, including testimony and evidence submitted in connection with his petition, the INS had concluded that Nesari's marriage to Eastin – the marriage through which Nesari had obtained conditional resident status – was entered into for the purposes of evading the immigration laws of the United States. Id. at 1063. Specifically, the INS explained that, based on a sworn statement from Eastin, along with the corroborating sworn statements of four of Nesari's former colleagues, the agency had concluded that Nesari's marriage to Eastin was not entered into in good faith, but for the purpose of securing resident status in the United States. Id. Nesari was granted sixty days to submit evidence to rebut the INS's intended denial of his Form I-751 Petition. Id. at 1065.

On August 27, 2002 and September 3, 2002, in response to the INS's Notice of Intent to Deny, Nesari, through counsel, submitted rebuttal and supplemental information, purporting to establish a bona fide marriage between himself and Eastin. See, e.g., id. at 466-68. For example, Nesari submitted a typewritten statement, written and signed by Eastin on September 10, 1999, stating that Eastin and Nesari met when "Joe [Nesari] proposed to [her] that [she] take his younger brother, Bahman as a new pin [sic] pal." Id. at 477. That statement further contends that "[t]hrough those

8

letters we [Eastin and Nesari] found love, honesty and built
trust," and that "[i]n 1996, [Eastin] decided to file a Fiancé
Petition for Bahman to allow him [to] come to the U.S. so that we
[Eastin and Nesari] could get married." Id. Nesari also
submitted a one-sentence handwritten statement, signed and dated
by Eastin on May 9, 2002, which simply stated the following: "The
statement[] written Sept. 9th [sic] detailing the events of my
marriage to Bahman was written by myself, and at my own free will,
and to this day rings true." Id. at 481.

   C. Removal Proceedings Before the Immigration Judge

   On October 21, 2002, the INS denied Nesari's I-751 Petition
after finding that Nesari had failed to establish that he and
Eastin had entered into and maintained a bona fide marriage. See
id. at 1069. On October 25, 2002, the agency accordingly issued a
Notice to Appear to Nesari, and commenced removal proceedings
against him in the United States Immigration Court. Nesari was
charged with removability under: (1) 8 U.S.C. § 1227(a)(1)(D)(i),
as an alien whose conditional permanent resident status has been
terminated; (2) 8 U.S.C. § 1227(a)(1)(G)(i), as an alien who
obtained admission through a marriage which was terminated within
2 years of admission, and who is therefore presumptively
considered to have procured admission through fraud; and (3) 8
U.S.C. § 1227(a)(1)(G)(ii), as an alien who engaged in a
fraudulent marriage for the purpose of procuring admission as an

immigrant. Id. at 1024-26; see also INA § 237.

On June 15, 2006, at the conclusion of the removal proceedings, the immigration judge ("IJ") assigned to the case, Robert Newberry, found Nesari removable under 8 U.S.C. § 1227(a)(1)(D)(i), in view of the denial of his I-751 Petition. The IJ dismissed the marriage fraud-related charges of removability under 8 U.S.C. §1227(a)(1)(G)(i) and (G)(ii), however, after finding that Nesari had apparently married Eastin in good faith, even though their marriage was eventually terminated through divorce. See Pl.'s Compl. at Ex. 1 (June 15, 2006 IJ decision). In reaching those conclusions, the IJ considered over 15 hours of witness testimony from 8 witnesses, along with extensive documentary evidence, and ultimately issued a 36-page decision finding that the government had "failed miserably" in its marriage fraud allegations and that Nesari had demonstrated "without a doubt that his marriage was in good faith and was not done for the purposes of securing his green card." Id. at 31. Finally, the IJ granted Nesari's application for adjustment of status to that a lawful permanent resident and therefore terminated all removal proceedings against him. See id. at 36.

D. Appeal to the Board of Immigration Appeals

On June 29, 2006, the DHS noticed its appeal of the IJ's decision to the Board of Immigration Appeals ("BIA"), advancing various arguments in support of its claim that the BIA should

overturn the IJ's decision.  See A.R. at 3106.  First, the DHS
asserted that the IJ had erred in granting Nesari a "good faith
marriage" waiver under 8 U.S.C. § 1186a, when two government
investigations had demonstrated that Nesari's marriage to his
United States citizen spouse was arranged by his brother for
purely immigration-related purposes.  Id. at 3107.  Second, the
DHS argued that Nesari was never lawfully admitted as a K-1 fiancé
because he was inadmissible at the time of his K-1 entry pursuant
to 8 U.S.C. § 1182(a)(7) and (a)(6), and thus was not properly
admitted as a permanent resident in accordance with the
immigration laws when he filed for adjustment of his status on a
conditional basis.  Id.  Specifically, the DHS explained that
Nesari had admitted that he and Eastin had never met in person
during the two years before he filed his K-1 petition for a fiancé
visa on or about March 1, 1996, as is required by 8 U.S.C.
§ 1182(a), and that Nesari was never formally granted an exemption
from the meeting requirement under 8 C.F.R. § 214.2(k) for
"extreme hardship."  Id.

     On December 18, 2007, after full briefing on the DHS's
appeal, the BIA dismissed the appeal, concluding that the DHS had
"not established that [Nesari] was not given a waiver" of the in-
person meeting requirement.  See Pl.'s Compl. ¶ 36, see also id.
at Ex. 2 (Dec. 18, 2007 BIA decision).  The BIA further found that
Nesari had presented sufficient evidence to demonstrate by a

11

preponderance of the evidence that his marriage was entered in good faith, and that the same evidence demonstrated that Nesari was not removable under 8 U.S.C. § 1227(a)(1)(G)(i) and (a)(1)(G)(ii).  Id.

## E. Naturalization Application and Prior Proceedings Before this Court

On or about February 6, 2008, Nesari, through counsel, filed an Application for Naturalization ("N-400 Application") with the USCIS.  See A.R. at 86.  On September 26, 2008, Nesari was interviewed on his N-400 Application at the USCIS Washington District Office.  Id. at 4311.  As part of its investigation, the USCIS also contacted Eastin, and on or about September 8, 2008, she provided an additional statement regarding her relationship with Nesari.  See id. at 390-91.  In reaffirming the statement she had provided on September 1, 1999, Eastin once again told the immigration authorities that her marriage to Nesari was not legitimate and that "Joe" Nesari, Bahman Nesari's brother, had raised the idea for her to marry Nesari so that Nesari could obtain a green card.  Id.  Eastin further stated that "she was heavily involved in drugs at the time, and figured there would be some way to benefit" from the sham marriage arrangement.  Id. at 390.

On May 20, 2009, Nesari filed a Complaint for Mandamus and Injunctive Relief in this Court, requesting that the Court order the USCIS to issue a decision on his naturalization application. See Bahman v. Napolitano, et al., Civ. Action No. 1:09cv566 (E.D.

12

Va. May 20, 2009) (Brinkema, J.).  On July 8, 2009, while that
initial Complaint was pending, Nesari was interviewed again on his
N-400 Application, with his immigration attorney present to assist
him.  See A.R. at 6.  During that interview, Nesari was
specifically questioned regarding the nature of his relationship
with Eastin, including whether he had met Eastin before his
arrival in the United States, and the circumstances surrounding
his first meeting with Eastin.  See id., see also id. at 22-26,
42-43.

    Before his interview, Nesari also completed a written, sworn
statement in response to questions posed by the USCIS in
connection with his N-400 Application.  See id. at 392-396.
Nesari signed that sworn statement under penalty of perjury,
certifying that his responses were "true and correct," and that he
had "read and fully underst[ood] the questions and answers in
[his] sworn statement."  Id. at 396.  One of the supplemental
questions asked Nesari to: "Describe the first time [he] met
Jessica Eastin in person. Who else was there? Where did you go?
How long were you together for the first meeting?"  Id. at 394.
Nesari first responded with the following: "The first time I met
Jessica [Eastin] it was at the airport in Detroit.  Jessica and my
brother[,] they came to pick me up for a week [in] Agest [August]
1996."  Id.  In a corrected attachment, Nesari then clarified that
"she [Eastin] came to Detroit airport and me and my brother went

13

to pick her up." Id. at 397. Nesari's answers about a meeting with Eastin in August 1996 were in direct contradiction to his previous testimony before the BIA that he and Eastin had first met about two months after he arrived in the United States, in October 1996. See id. at 3693-94 (220:22 - 221:4).

During his July 8, 2009 naturalization interview, Nesari also stated under oath that Eastin had made two different trips to Michigan to meet him, the first in August 1996, and the second in November 1996, when they were married. See id. at 25, 54. Later in the interview, however, when the interviewing officer pointed out the discrepancies in the dates in Nesari's testimony, he admitted that Eastin had actually made only one trip to Michigan around either the last week of October 1996 or the first week of November 1996, to meet him for the first time about a week or so before their marriage on November 2, 1996. Id.

On July 16, 2009, Nesari and the government filed a Joint Consent Order to Dismiss and Remand Nesari's pending federal action, because his N-400 Application would be adjudicated within 30 days of the date of that July 16, 2009 Joint Consent Order. Nesari's initial Complaint was therefore dismissed without prejudice, and the matter was remanded to the USCIS for adjudication. See Nesari v. Napolitano, et al., Civ. Action No. 1:09cv566, at Dkt. No. 8 (July 16, 2009 Consent Order to Dismiss and Remand).

On August 7, 2009, the USCIS issued a decision denying Nesari's N-400 Naturalization Application because he had failed to establish that he had been lawfully admitted for permanent residence, and because he additionally had not established his good moral character.  See A.R. at 51-55.  In its decision, the USCIS explained to Nesari, inter alia:

> First, you have not been lawfully admitted for permanent residence as required by the Immigration and Nationality Act.  You misrepresented material facts about yourself in pursuit of an immigration benefit, lawful permanent residence, and you were statutorily ineligible to receive the fiancé visa you used to enter the United States. Second, you provided false statements about yourself during your naturalization interview while in pursuit of an immigration benefit.
>
> . . .
>
> You failed to meet the requirements of a K-1 visa beneficiary in that you and Jessica Eastin had not met each other within the two-year period before the fiancé petition was filed.  Your fiancé petition was approved in violation of Section 214 of the INA by error of the Service.

A.R. at 22-24, 51-53.  The USCIS also informed Nesari that the "Service is not bound in naturalization proceedings by decisions issued by the immigration judge in removal proceedings either terminating removal proceedings or granting cancellation of removal."  Id. at 25, 54 (citing INA § 318 ("[T]he findings of the Attorney General in terminating removal proceedings or in cancelling the removal of an alien pursuant to the provisions of this Act, shall not be deemed binding in any way upon the Attorney General with respect to the question of whether such person has established his eligibility for naturalization.")).

15

### F.   Request for Reconsideration

On September 3, 2009, Nesari, through his counsel, filed an N-336 Request for Hearing on the decision to deny his N-400 Application, seeking reconsideration of that decision pursuant to 8 U.S.C. § 1447(a) and INA § 336(a).  See A.R. at 17-21.  In Nesari's five-page appeal, he argued that contrary to the USCIS's findings: (1) he had been lawfully admitted for permanent residence, as demonstrated by the IJ's and the BIA's findings that Nesari had married Eastin in good faith, and the subsequent grant of a waiver of the joint filing requirement for removal of the conditions on residence; (2) he had demonstrated good moral character; and (3) the USCIS was indeed bound by the findings of the IJ and the BIA.  Id.

On December 17, 2009, a review hearing was conducted on Nesari's N-336 Request for Hearing and for Reconsideration.  While the decision on Nesari's N-336 Request was pending, Nesari filed another Complaint for Mandamus and Injunctive Relief before this Court, asserting that the USCIS's failure to adjudicate his N-336 Request within 120 days of his review hearing violated, among other relevant provisions, the INA, the Administrative Procedure Act, and the Constitution.  See Nesari v. Taylor, et al., Civ. Action No. 1:10cv1015 (E.D. Va. Sept. 9, 2010) (Brinkema, J.).  On November 3, 2010, however, the USCIS issued its decision on Nesari's N-336 Request, affirming its August 7, 2009 denial of his N-400 Application.  See A.R. at 1-7.  On November 8, 2010, counsel

16

for defendants therefore moved to dismiss Nesari's September 9, 2010 Complaint for mootness and lack of jurisdiction. <u>See</u> <u>Nesari v. Taylor, et al.</u>, Civ. Action No. 1:10cv01015, at Dkt. No. 6.

On December 31, 2010, Nesari, through counsel, filed a Motion for Leave to Supplement Pleadings pursuant to Fed. R. Civ. P. 15(d), seeking to amend his September 9, 2010 Complaint to include a Petition for Review of Denial of Application for Naturalization pursuant to 8 U.S.C. § 1421(c) and a Request for <u>De Novo</u> Hearing. <u>Id.</u> at Dkt. No. 16. On January 7, 2011, after a hearing on Nesari's Rule 15(d) motion, the Court denied that motion, granted the government's Motion to Dismiss, and ordered that Nesari's second Complaint for Mandamus and Injunctive Relief be dismissed as moot. <u>See</u> <u>id.</u> at Dkt. Nos. 19 and 20.

G. The Instant Civil Action

On January 7, 2011, Nesari filed the instant "Petition for Review of Denial of Application for Naturalization Pursuant to 8 U.S.C. § 1421(c) and Request for <u>De Novo</u> Hearing." <u>See</u> <u>Nesari v. Taylor et al.</u>, Civ. Action No. 1:11cv19 (E.D. Va. Jan. 7, 2011) (Brinkema, J.), at Dkt. No. 1. In that Petition, Nesari seeks <u>de novo</u> judicial review of the denial of his naturalization application, pursuant to 8 U.S.C. § 1421(c), which provides that:

> A person whose application for naturalization under this subchapter is denied, after a hearing before an immigration officer under section 1447(a) of this Title, may seek review of such denial before the United States district court for the district in which such person resides . . . . Such review shall be <u>de novo</u>, and the court shall make its own findings of fact and

17

> conclusions of law and shall, at the request of the petitioner, conduct a hearing <u>de</u> <u>novo</u> on the application.

8 U.S.C. § 1421(c).

Throughout the course of this litigation, however, Nesari has failed to diligently prosecute his 8 U.S.C. § 1421(c) petition or to comply with his discovery obligations. Specifically, on March 9, 2011, the Court issued an Initial Scheduling Order, which commenced the discovery period in this civil action and provided, among other things, that the parties should confer to develop a joint discovery plan. <u>See</u> Dkt. No. 8. On March 23, 2011, pursuant to that Initial Scheduling Order, the parties filed a Joint Proposed Discovery Plan setting out the deadlines for discovery in this case. <u>See</u> Dkt. No. 9. That document stated that discovery was to close on July 15, 2011, and that the parties would exchange all initial disclosures required by Fed. R. Civ. P. 26(a)(1) by April 6, 2011. <u>Id.</u> This Court adopted the parties' proposed discovery plan, including all deadlines, by a Rule 16(b) Scheduling Order dated May 30, 2011. <u>See</u> Dkt. No. 11.

Defendants served their Rule 26(a)(1) disclosures on Nesari on April 6, 2011, and then filed supplemental disclosures on April 21, 2011. <u>See</u> Dkt. No. 35 (Mem. of Law in Supp. of Defs.' Mot. to Compel) at 1-2. Petitioner, however, did not provide his initial disclosures to the government by the required deadline. At the

18

time, Nesari was proceeding pro se,[6] and for over a month after

the April 6, 2011 deadline, he simply failed to respond to the

government's repeated requests for those documents.  Id. at 2-3.

On May 21, 2011, Nesari finally responded via e-mail, stating that

he did not understand his discovery obligations, that he was out

of the country in Iran, and that he was looking to hire legal

counsel to represent him in this matter.  Id. at Ex. 3.  Nesari

asked for a brief extension of time to serve his disclosures, and

defendants agreed to allow him to file his disclosures by noon on

May 27, 2011.  Id. at 3-4.  By the afternoon of May 27, however,

Nesari had still not complied with his initial discovery

obligations, and defendants therefore filed a Motion to Compel.

See Dkt. No. 34.

After a hearing on June 3, 2011, at which Nesari failed to

appear, the Honorable Ivan D. Davis, United States Magistrate

Judge, granted the defendants' motion and issued an Order

requiring Nesari to contact counsel for the defendants by no later

than June 10, 2011, and to produce his initial disclosures to

---

[6] Nesari was pro se for a period of several months,
beginning on April 5, 2011, when this Court granted his original
counsel's Motion to Withdraw as Attorney on the grounds that
Nesari was failing to comply with his payment obligations.  See
Dkt. No. 12 (First Mot. to Withdraw as Attorney); Dkt. No. 14
(April 5, 2011 Order granting Motion to Withdraw).  For a brief
period of time, Nesari's brother, Yousof Whetzel Nesari, entered
an appearance on his behalf, see Dkt. No. 24, but the Court
terminated that representation by an Order dated April 29, 2011,
for obvious conflict of interest reasons, see Dkt. No. 28.  On
June 21, 2011, an experienced local attorney by the name of
Robert Lee Jenkins, Jr. entered an appearance on Nesari's behalf.
See Dkt. No. 45.

19

defense counsel by no later than 5 p.m. on June 14, 2011. Dkt. No. 40 (June 3, 2011 Order). The Order further warned that "[i]f Plaintiff [Nesari] fails to produce discovery or contact defense counsel by the above stated deadlines, then this Court will order the Plaintiff to show cause why this Court should not recommend to the District Judge that Plaintiff's case be dismissed . . . for Plaintiff's failure to prosecute." Id.

By June 16, 2011, petitioner still had not complied with his outstanding discovery obligations, nor had he returned to the United States to be deposed. Defendants therefore filed a Motion for Summary Judgment based on the evidence in the underlying administrative record. See Dkt. No. 41. On June 21, 2011, however, Nesari's current counsel entered a Notice of Appearance on his behalf, see Dkt. No. 45, and on June 28, 2011, Nesari filed a Consent Motion for Extension of Time to Complete Discovery, seeking an extension of all discovery deadlines until August 1, 2011, see Dkt. No. 46. On July 8, 2011, defendants then filed a second Motion to Compel, once again seeking an order compelling Nesari to serve full and complete responses to their discovery requests. See Dkt. No. 55.

By an Order dated July 15, 2011, this Court granted both parties' motions in part and ordered that Nesari provide written responses to all outstanding discovery requests by no later than July 22, 2011, and that he make himself available for a deposition no later than July 28, 2011. See Dkt. No. 64 (July 15, 2011

Order).  The Court then held defendants' Motion for Summary

Judgment in abeyance, awaiting the completion of that additional

discovery.  Id.  In the interim, Nesari had also filed his own

Motion for Summary Judgment, see Dkt. No. 59, and the Court

therefore further ordered that Nesari appear before the Court for

a de novo evidentiary hearing at 1:00 p.m. on Thursday, August 4,

2011, to determine his eligibility for naturalization and to

resolve the parties' pending cross-motions for summary judgment.

Id.

        Once again, however, Nesari did not comply with the discovery

and deposition deadlines set forth in this Court's July 15, 2011

Order, nor did he arrange to return to the United States to be

available for the August 4, 2011 hearing.  Instead, on July 21,

2011, Nesari filed a Motion for Voluntary Dismissal pursuant to

Fed. R. Civ. P. 41(a)(2).  See Dkt. No. 66.  In that motion, and

in prior briefing in advance of the July 15, 2011 hearing,

Nesari's counsel offered various excuses for Nesari's failure to

properly prosecute this civil action, ranging from medical issues

to financial difficulties.  See, e.g., Dkt. No. 62 (Opp. to

[Defs.'] Mot. to Compel Discovery) at 2 (claiming that Nesari has

experienced numbness and paralysis in his hands, fingers, and

wrists, which has prevented him from returning to the United

States)[7]; see also Dkt. No. 66 (Mot. for Voluntary Dismissal) ¶ 2

---

        [7]  During the hearing on July 15, 2011, Nesari's counsel
clarified that Nesari has been diagnosed with carpal tunnel
syndrome.  However, counsel failed to adequately explain why that

("The Petitioner is unable to sustain the cost associated with prosecuting this matter.").

Defendants have opposed Nesari's Motion for Voluntary Dismissal, arguing that dismissal without prejudice under Fed. R. Civ. P. 41(a)(2) is improper at this late stage of the litigation, particularly in light of Nesari's complete and utter failure to comply with his discovery responsibilities. See Dkt. No. 67. In an Order dated July 26, 2011, the Court therefore ordered Nesari to appear on Friday, August 5, 2011 to show cause as to why his petition should not be dismissed with prejudice. See Dkt. No. 68 (July 26, 2011 Order). Nesari's counsel appeared at that show cause hearing, but Nesari himself did not. In fact, to the Court's knowledge, Nesari is still out of the country, with no immediate plans to return to the United States. Moreover, to this date, Nesari has still not complied with any of the government's outstanding discovery requests.

In light of Nesari's continued absence from this jurisdiction, the Court cannot hold a de novo evidentiary hearing on petitioner's eligibility for naturalization. Instead, the Court will proceed to rule on the pending Cross-Motions for Summary Judgment [Dkt. Nos. 41 and 59] on the basis of the extensive administrative record submitted to the Court, which provides sufficient information to resolve the instant motions.

---

medical condition would prevent Nesari from traveling from Iran to the United States to pursue this 8 U.S.C. § 1421(c) petition.

## II.  Standards of Review

Summary judgment is appropriate where the record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P 56(c).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 247-48 (1986).  The Court must view the record in the light most favorable to the nonmoving party, and must draw all inferences in favor of that party. See Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 132 (4th Cir. 2002).  However, "the mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." Anderson, 477 U.S. at 252; see also Othentec Ltd. v. Phelan, 526 F.3d 135, 140 (4th Cir. 2008).  Accordingly, to survive a motion for summary judgment, "[t]he disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate to support a jury verdict." Thompson Everett, Inc. v. Nat'l Cable Adver., LP, 57 F.3d 1317, 1323 (4th Cir. 1995); Poole v. Pass, 351 F. Supp. 2d 473, 478 (E.D. Va. 2005).

In civil actions under 8 U.S.C. § 1421(c), which provides a mechanism for appealing the USCIS's denial of an application for

23

naturalization, a district court is empowered to conduct a <u>de</u> <u>novo</u> review of the record, to hold evidentiary hearings, and to make additional factual findings.  <u>See</u> <u>Laryea v. United States</u>, 300 F. Supp. 2d 404, 405 (E.D. Va. 2004) (Ellis, J.).  Specifically, 8 U.S.C. § 1421(c) provides that the court's review of a naturalization decision "shall be <u>de</u> <u>novo</u>, and the court shall make its own findings of fact and conclusions of law."  <u>Id.</u>  In fact, "[j]udicial review of naturalization denials is always available and is <u>de</u> <u>novo</u>, and is not limited to any administrative record, but rather may be on facts established in and found by the district court."  <u>Chan v. Gantner</u>, 464 F.3d 289, 291 (2d Cir. 2006); <u>see also</u> <u>United States v. Hovsepian</u>, 359 F.3d 1144, 1162 (9th Cir. 2004) (stating that "even if the INS is allowed to make the initial decision on a naturalization application, the district court has the final word and does not defer to any of the INS's findings or conclusions").

## III.  Discussion

For the following reasons, the Court will deny Nesari's Motion for Voluntary Dismissal under Fed. R. Civ. P. 41(a)(2) [Dkt. No. 66], along with his Cross-Motion for Summary Judgment [Dkt. No. 59], and will grant defendants' Motion for Summary Judgment [Dkt. No. 41] and enter final judgment in favor of the defendants by an Order to be issued with this Memorandum Opinion.

### A.  Motion for Voluntary Dismissal [Dkt. No. 66]

As an initial matter, the Court will deny petitioner's Motion
for Voluntary Dismissal pursuant to Fed. R. Civ. P. 41(a)(2) [Dkt.
No. 66].  That rule provides that a district court may dismiss an
action at the plaintiff's request "only by court order, on terms
that the court considers proper."  Fed. R. Civ. P. 41(a)(2).
Moreover, "[u]nless the order states otherwise, a dismissal under
this paragraph [Fed. R. Civ. P. 41(a)(2)] is without prejudice."
Id.

In this case, however, dismissal of Nesari's 8 U.S.C.
§ 1421(c) petition without prejudice would be entirely
inappropriate.  "The basic purpose of Rule 41(a)(2) is to freely
permit the plaintiff, with court approval, to voluntarily dismiss
an action *so long as no other party will be prejudiced*."  LeCompte
v. Mr. Chip, Inc., 528 F.2d 601, 604 (5th Cir. 1976) (emphasis
added).  As such, in deciding how to rule on a motion to
voluntarily dismiss, "a district court should consider factors
such as the opposing party's effort and expense in preparing for
trial, excessive delay and lack of diligence on the part of the
movant, and insufficient explanation of the need for a voluntary
dismissal, as well as the present stage of litigation."  Miller v.
Terramite Corp., 114 Fed. Appx. 536, 539 (4th Cir. 2004) (internal
citations and quotations omitted).  The Fourth Circuit has
specifically held that a motion to voluntarily dismiss under Rule
41(a)(2) should be denied when a plaintiff seeks to circumvent an

expected adverse result, and that "denial of voluntary dismissal
is appropriate where summary judgment is imminent." <u>Skinner v.
First Am. Bank of Va.</u>, No. 93-2493, 1995 WL 507264, at *2 (4th
Cir. Aug. 28, 1995); <u>see also</u> <u>Davis v. USX Corp.</u>, 819 F.2d 1270,
1274 (4th Cir. 1987).

Here, Nesari moved to voluntarily dismiss his petition just
two weeks before the Court was scheduled to hold a <u>de novo</u>
evidentiary hearing to evaluate his claims, and after the
government and this Court had already expended significant
resources in connection with this civil action.  More specifically,
in response to Nesari's 8 U.S.C. § 1421(c) petition, defendants
produced over 7,000 pages of documents from the underlying
administrative record, and then filed a comprehensive Motion for
Summary Judgment on the basis of that record.  <u>See</u> Dkt. Nos. 18 and
29 (Notices of Filing of Administrative Record); <u>see also</u> Dkt. No.
41 (Defs.' Mot. for Summ. J.).  During the motion hearing on July
15, 2011, this Court expressed a strong inclination to grant the
defendants' dispositive summary judgment motion, but ultimately
held any ruling on that motion in abeyance so that the parties
could complete additional discovery, as petitioner himself had
requested.  <u>See</u> Dkt. No. 64; <u>see also</u> Dkt. No. 46 (Nesari's Mot.
for Extension of Time to Complete Discovery).

The Court then scheduled an evidentiary hearing for August 4,
2011, and ordered that Nesari provide written responses to all
outstanding discovery requests and make himself available for a

deposition in advance of that hearing. <u>See</u> Dkt. No. 64 (July 15, 2011 Order). The Court also requested that Eastin (a/k/a "Marijane Star") appear before the Court to provide testimony during the evidentiary hearing, <u>see id.</u>, and on July 19, 2011, Eastin was accordingly served with a subpoena. <u>See</u> Dkt. No. 65. "[I]n view of the nature of the testimony that would be elicited from Ms. Star [Eastin] at the hearing," the government requested that she be appointed counsel to represent her and to advise her of her Fifth Amendment rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), and an attorney from the Federal Public Defender's Office was therefore appointed, at the taxpayers' expense, to represent Eastin in connection with this matter. <u>Id.</u>

Under these circumstances, granting Nesari's motion to voluntarily dismiss his petition without prejudice under Fed. R. Civ. P. 41(a)(2) would result in significant hardship and prejudice to the government. This is the *third* federal lawsuit that Nesari has brought in connection with his naturalization application, and in the case at bar alone, the defendants have clearly incurred substantial costs in responding to Nesari's petition, gathering and producing discovery materials, and filing and arguing various motions. This Court has also devoted significant time and attention to the case, and the Federal Public Defender's Office has been forced to divert some of its scarce and valuable resources to the matter. Particularly in light of the late stage of this litigation - where discovery has closed and

27

defendants have filed a compelling motion for summary judgment that is ripe for adjudication - granting the petitioner's motion to dismiss under Fed. R. Civ. P. 41(a)(2) would simply "waste judicial resources." Miller, 114 Fed. Appx. at 540 (affirming a district court order refusing to grant plaintiff's motion for voluntary dismissal "because [the motion] is untimely and would waste judicial resources" since it was filed after discovery had closed and a dispositive order was imminent); see also Howard v. Inova, 302 Fed. Appx. 166, 180 (4th Cir. 2008) (holding that the district court had not abused its discretion when it denied plaintiff's Rule 41(a) motion because the case had advanced to the summary judgment stage and the parties had already incurred substantial costs in discovery).

Nesari's "excessive delay and lack of diligence," Miller, 114 Fed. Appx. at 539, in the prosecution of his 8 U.S.C. § 1421(c) petition is another strong factor counseling against voluntary dismissal of this case. Nesari has engaged in dilatory tactics throughout the entire discovery period in this action; indeed, he failed to produce any discovery whatsoever in response to the defendants' repeated discovery requests, and he has evaded all efforts to procure his sworn testimony during a deposition or an evidentiary hearing - all in violation of multiple orders of this Court. See Dkt. No. 40 (June 3, 2011 Order requiring Nesari to contact defense counsel and produce initial discovery disclosures); Dkt. No. 64 (July 15, 2011 Order again requiring

Nesari to provide written discovery responses, and further
ordering him to make himself available for a deposition and to
appear before the Court for an evidentiary hearing).  Nesari's
lack of diligence alone could constitute grounds for involuntary
dismissal of this action under Fed. R. Civ. P. 41(b).  As it
stands, however, his failure to comply with even his most basic
discovery obligations renders his Motion for Voluntary Dismissal
under Fed. R. Civ. P. 41(a)(2) completely unavailing.

       For all these reasons, allowing Nesari to voluntarily dismiss
this civil action without prejudice, thereby avoiding an adverse
summary judgment ruling and preserving his ability to potentially
file a *fourth* naturalization-related petition before this Court,
would be the height of judicial futility.  Furthermore, in view of
Nesari's failure to lift a finger during the discovery process,
all while this Court and the federal government were laboring
diligently to respond to a petition that Nesari himself had filed,
granting the Motion for Voluntary Dismissal at this belated date
would send exactly the wrong message about the use (and abuse) of
the federal judiciary's limited resources.  Accordingly, Nesari's
Motion for Voluntary Dismissal pursuant to Fed. R. Civ. P.
41(a)(2) [Dkt. No. 66] will be denied, and the Court will proceed
to adjudicate the merits of this case on the parties' cross-
motions for summary judgment.

       **B.   Cross-Motions for Summary Judgment [Dkt. Nos. 41 and 59]**
       An applicant seeking to obtain the privilege of United States

29

citizenship bears the burden of proof to establish that he or she
is eligible for naturalization.  Rogers v. Bellei, 401 U.S. 815,
839 (1971) ("No alien has the slightest right to naturalization
unless all statutory requirements are complied with"); INS v.
Pangilinan, 486 U.S. 875, 886 (1988) ("[I]t has been universally
accepted that the burden is on the alien applicant to show his
eligibility for citizenship in every respect.").  Courts therefore
"have the power to confer citizenship only 'in strict compliance
with the terms of an authorizing statute.'"  Cody v. Caterisano,
631 F.3d 136, 142 (4th Cir. 2011) (quoting Pangilinan, 486 U.S. at
884).

     "[T]he burden is on the alien applicant to show his
eligibility for citizenship in every respect," and any doubts
regarding an applicant's eligibility for naturalization "should be
resolved in favor of the United States and against the claimant."
Berenyi v. Dist. Dir., INS, 385 U.S. 630, 637 (1967) (citing
United States v. Macintosh, 283 U.S. 605, 626 (1931)); see also 8
C.F.R. § 316.2.  In particular, the applicant has the burden of
proving, inter alia, that he was lawfully admitted to the United
States for permanent residence, and that he is of good moral
character.  See 8 U.S.C. § 1429 ("[N]o person shall be naturalized
unless he has been lawfully admitted to the United States for
permanent residence . . . ."); 8 C.F.R. § 316.2(b) (providing that
the applicant for naturalization "shall bear the burden of
establishing by a preponderance of the evidence that he or she

30

meets all of the requirements for naturalization, including that
the applicant was lawfully admitted as a permanent resident to the
United States, in accordance with the immigration laws in effect
at the time"); 8 C.F.R. § 316.10(a)(1) ("[A]n applicant for
naturalization bears the burden of demonstrating that, during the
statutorily prescribed period, he or she has been and continues to
be a person of good moral character.").

     In this case, defendants advance several distinct arguments
in support of their contention that Nesari is not statutorily
entitled to naturalization.  Specifically, defendants argue that
Nesari was never lawfully admitted as a permanent resident of the
United States, as defined by U.S.C. § 1101(a)(20), and that he has
failed to demonstrate good moral character, as required by 8
U.S.C. § 1427(a) and 8 C.F.R. § 316.2(a)(7).  <u>See</u> Defs.' Mot. for
Summ. J. at 2-3, 23-30.  The parties in this civil action also
strenuously dispute the validity of Nesari's marriage to Eastin,
with Nesari arguing that he married Eastin in good faith, <u>see</u>
Pet'r's Mem. in Supp. of Cross-Mot. for Summ. J. at 6-13, 25-30,
while the government suggests that he committed marriage fraud in
an effort to obtain a green card, <u>see</u> Defs.' Mot. for Summ. J. at
27-30.

### 1.  Marriage fraud and moral character

     This Court will not pass judgment at this time on whether or
not Nesari and Eastin's "I do"s were genuine.  Although the 7,000-
page administrative record in this case gives new meaning to the

31

term "voluminous," it does not conclusively answer the question of whether Nesari's marriage to Eastin was <u>bona fide</u> or fraudulent. Indeed, the administrative record contains almost as many contradictions as pages, including at least four separate statements from Eastin herself, two of which flatly contradict the others. <u>Compare</u> A.R. at 477-80 (September 10, 1999 typewritten statement, avowing that the marriage was <u>bona fide</u>) and A.R. at 480 (handwritten statement from Eastin confirming that "[t]he statement . . . detailing the events of my marriage to Bahman was written by myself, and at my own free will, and to this day rings true") <u>to</u> A.R. at 390-91 (statement from Eastin to a government investigator that she had married Nesari at his brother's suggestion, and that "she never considered the marriage 'a real marriage'") and A.R. at 868-75 (Eastin's September 1, 1999 handwritten affidavit, stating that she had never met Nesari before he came to the United States, that Nesari's brother filled out the immigration forms for her "and I [Eastin] signed," and that she had married Nesari because she had "hit rock bottom" at the time, and Nesari and his brother promised her "security, [a] place to live, and a job").

In light of additional contradictory testimony from other witnesses in the proceedings below, including Nesari's friends, relatives, and co-workers, it is simply impossible to determine which of Eastin's many statements reflects the actual truth, and whether the marriage between Eastin and Nesari was legitimate or a

sham.  See, e.g., A.R. at 946-67 (sworn affidavits of four of
Nesari's co-workers, who testified that they understood his
marriage to Eastin to be a sham); id. at 482-95 (handwritten
statements from two of Nesari's relatives, averring that Nesari
and Eastin's marriage was legitimate and that the couple shared a
bed); id. at 292-99 (affidavits and letters from Eastin's mother,
several of Nesari's colleagues and friends, and Nesari's former
English teacher, purporting to establish that Nesari and Eastin
had a bona fide marital relationship).  Under these circumstances,
and in the absence of conducting a full-blown de novo evidentiary
hearing, this Court is in no position to adjudicate the validity
of Nesari and Eastin's failed nuptials.[8]

     The Court also declines the government's invitation to render
judgment on Nesari's "moral character" at this time.  To be sure,
the record is clear that Nesari made several false or inaccurate
statements in his July 8, 2009 naturalization interview concerning
the timing and circumstances of his first meeting with Eastin.
Specifically, Nesari falsely stated under oath and in a written,
sworn statement that he had first met Eastin in August of 1996,
but he then later admitted that he and Eastin had only met once,

_____

     [8]  The simple fact that Nesari has failed to participate in
discovery in this civil action or to return to the United States
for a deposition or an evidentiary hearing is highly suspicious
and could easily give rise to the adverse inference that Nesari
has something to hide.  Nevertheless, without the benefit of
holding an evidentiary hearing at which the Court could observe
the demeanor of Eastin, Nesari, and other relevant witnesses, the
Court simply cannot render a conclusive judgment at this time as
to whether the Nesari-Eastin marriage was genuine.

in late October 1996, before their November 1996 marriage. <u>See</u> A.R. at 25, 54, 394; <u>see also</u> <u>id.</u> at 3693-94 (220:22 - 221:4). Under 8 C.F.R. § 316.10(b)(2)(vi), false statements need not be material to bar a finding of good moral character, and "even the most immaterial of lies with the subjective intent of obtaining immigration or naturalization benefits" can justifiably prevent a finding of good moral character. <u>Kungys v. United States</u>, 485 U.S. 759, 779-80 (1988). Defendants thus argue that Nesari's false statements alone establish that he does not possess the "good moral character" required to become a naturalized citizen of this country. <u>See</u> Defs.' Mot. for Summ. J. at 27-30.

However, for false statements to disqualify someone from eligibility for naturalization, the Supreme Court has held that the statements must have been "made with the subjective intent of obtaining immigration benefits," and not simply as a result of a momentary lapse in recall. <u>Kungys</u>, 485 U.S. at 780. Here, there is admittedly some evidence to support the inference that Nesari acted with the requisite <u>mens</u> <u>rea</u>, as he was no doubt acutely aware at the time that he made his statements that the fact that he had only met Eastin once - and only a week or so before they were married - could prove harmful to his naturalization efforts. On the other hand, the questions that Nesari was asked concerned specific details of events that took place in 1996, almost *13 years* before his July 8, 2009 naturalization interview. Under those circumstances, it is entirely possible that Nesari was

34

simply confused and inadvertently mixed up his dates by a month or
two.  After all, it would be the rare person indeed who is able to
recall with perfect clarity what happened to them over a decade
ago.  This Court therefore will not express any judgment at this
time as to whether Nesari's incorrect statements during his
naturalization interview were made with the subjective intent to
deceive and should operate to disqualify him from eligibility for
naturalization.

### 2.   Lawful admission to the United States

Instead, this case can be resolved on a much simpler and
narrower basis: namely, Nesari is not entitled to naturalization
as a United States citizen because he was never lawfully admitted
into the United States in accordance with the in-person meeting
requirement of 8 U.S.C. § 1184(d)(1).  As a result, the K-1 fiancé
visa which Nesari used to enter the United States was invalid and
void ab initio, and that erroneously-issued K-1 visa confers no
lawful status on Nesari.  For those reasons, petitioner is
statutorily ineligible for naturalization, and judgment must be
entered in favor of the defendants as a matter of law.

### a.   *Statutory Framework*

Among other statutory requirements for naturalization, an
alien applicant seeking to become a United States citizen "must
establish that he or she has been *lawfully admitted* as a permanent
resident of the United States.  See 8 U.S.C. § 1429 ("[N]o person
shall be naturalized unless he has been lawfully admitted to the

35

United States for permanent residence in accordance with all
applicable provisions of this chapter."). "The term 'lawfully
admitted for permanent residence' means the status of having been
lawfully accorded the privilege of residing permanently in the
United States as an immigrant in accordance with the immigration
laws, such status not having changed." 8 U.S.C. § 1101(a)(20).
Whether the applicant was actually admitted to the United States
or had his or her status adjusted to that of a permanent resident
is not dispositive. Rather, the pertinent question is whether the
applicant, at the time of his adjustment, was "lawfully accorded"
such status, in strict compliance with all applicable statutory
requirements. See id.

     Importantly, the term "'lawfully' denotes compliance with
substantive legal requirements, not mere procedural regularity."
Matter of Longstaff, 716 F. 2d 1439, 1441 (5th Cir. 1983). As
such, "the substance of [the] action" admitting the applicant to
the United States for permanent residence must have "complied with
the governing law." De La Rosa v. U.S. Dep't of Homeland Sec.,
489 F.3d 551, 554 (2d Cir. 2007); see also Fedorenko v. United
States, 449 U.S. 490, 505 (1981) (affirming the decision to
denaturalize a plaintiff based on a finding that he was ineligible
for a visa); United States v. Koreh, 59 F.3d 431 (3d Cir. 1995)
(upholding denaturalization because the individual did not fall
within the criteria required by the statute pursuant to which his
visa was issued, and finding that he accordingly was not lawfully

36

eligible for the visa when he entered the United States).

The specific governing provision of law relevant here, 8

U.S.C. § 1184(d)(1), provides, in pertinent part, that:

> A visa [to a fiancé of a United States citizen] . . .
> . shall be approved only after satisfactory evidence
> is submitted by the petitioner to establish that <u>the
> parties have previously met in person</u> within 2 years
> before the date of filing the petition, have a bona
> fide intention to marry, and are legally able and
> actually willing to conclude a valid marriage in the
> United States within a period of ninety days after
> the alien's arrival, except that the Secretary of
> Homeland Security in his discretion may waive the
> requirement that the parties have previously met in
> person.

8 U.S.C. § 1184(d)(1) (emphasis added). Additionally, applicable

DHS regulations provide that:

> As a matter of discretion, the director may exempt
> the petitioner from th[e meeting] requirement only if
> it is established that compliance would result in
> extreme hardship to the petitioner or that compliance
> would violate strict and long-established customs of
> the K-1 beneficiary's foreign culture or social
> practice, as where marriages are traditionally
> arranged by the parents of the contracting parties
> and the prospective bride and groom are prohibited
> from meeting subsequent to the arrangement and prior
> to the wedding day. . . .
>
> Failure to establish that the petitioner and K-1
> beneficiary have met within the required period or
> that compliance with the requirement should be waived
> shall result in the denial of the petition.

8 C.F.R. § 214.2(k)(2). Taken together, 8 U.S.C. § 1184(d)(1) and

8 C.F.R. § 214.2(k)(2) prove fatal to Nesari's naturalization

petition.

### b. *Alleged Preclusive Effect of Prior BIA Decision*

As a preliminary matter, this Court is well aware that the

37

BIA previously determined, in the context of determining whether
Nesari should be removed from the United States, that Nesari was
lawfully admitted to the country as a K-1 fiancé because "[t]he
Form I-129F was approved by the INS and the DHS has not
established that the respondent was not given a waiver of the
requirement that the petitioner and beneficiary have met."  A.R.
at 29.  Nesari argues vigorously that those findings should bind
this Court, and that "[i]t is not within the district court's
purview to re-adjudicate Bahman's [Nesari's] Lawful Permanent
Resident (LPR) status."  See Pet'r's Amend. Opp. to Defs.' Mot.
for Summ. J. ("Pet'r's Opp.") at 2-3.  In effect, Nesari's
argument boils down to the assertion that this Court owes a form
of Chevron deference to the findings and conclusions of the BIA in
the previous removal proceedings involving Nesari, and that the
BIA's prior holdings should therefore effectively supplant this
Court's judgment and foreclose the de novo review set forth in 8
U.S.C. § 1421(c).

        Those arguments are unavailing.  First, deference to the
administrative agency under the Chevron doctrine, as such, is
somewhat misplaced in this context, because Chevron is usually
invoked for the proposition that courts should defer to an
agency's interpretation of a statute that it is charged with
implementing, not its factual findings.  See Chevron U.S.A., Inc.
v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984).
Moreover, even if Chevron were applicable to the BIA's mixed

findings of fact and conclusions of law regarding Nesari's immigration status, the BIA's assertion that "the DHS has not established that the respondent was not given a waiver of the [in-person meeting] requirement," A.R. at 29, does not reflect a reasonable or permissible construction of the relevant statutes and implementing regulations concerning *naturalization*, all of which place the burden of establishing eligibility for lawful admission squarely on *the applicant*'s shoulders. <u>See</u> 8 U.S.C. § 1429; 8 C.F.R. § 316.2(b); <u>see also</u> <u>Berenyi</u>, 385 U.S. at 637.

In short, this Court simply cannot square the BIA's holding, which was issued in the separate context of Nesari's removal proceedings, with the plain language of 8 C.F.R. § 316.2(b), which provides that applicants for naturalization "shall bear the burden of establishing by a preponderance of the evidence that he or she meets all of the requirements for naturalization, including that the applicant was lawfully admitted as a permanent resident to the United States." 8 C.F.R. § 316.2(b). That text makes pellucidly clear that it is the naturalization petitioner who must affirmatively prove lawful admission, including any waiver of otherwise operable prerequisites to such lawful admission. By contrast, the government bears no concomitant burden to prove that the petitioner is *not* entitled to become a United States citizen. When applied to the instant naturalization controversy, therefore, the BIA's efforts to force the government to prove a negative, <u>i.e.</u>, to show "that the respondent was not given a waiver of the

requirement that the petitioner and beneficiary have met," A.R. at 29, get matters exactly backwards.

Furthermore, and perhaps even more importantly, deference to the executive agency's conclusions simply does not apply in this particular situation, where 8 U.S.C. § 1421(c) makes clear that the district courts must review the USCIS's denial of a naturalization application <u>de</u> <u>novo</u>. <u>See</u> 8 U.S.C. § 1421(c); <u>see also</u> <u>Chan</u>, 464 F.3d at 291 ("Judicial review of naturalization denials is always available and is <u>de</u> <u>novo</u>, and is not limited to any administrative record."). That system of <u>de</u> <u>novo</u> review for naturalization applications stands in "sharp contrast" to the more deferential review that courts provide in the context of other immigration appeals: "whereas judicial review in other immigration contexts, such as removal or asylum, is highly deferential and expressly limited by statute," in the naturalization context, the Court is not limited to the facts in the administrative record, and in fact is permitted to engage in its own <u>de</u> <u>novo</u> fact finding. <u>Mobin v. Taylor</u>, 598 F. Supp. 2d 777, 780 (E.D. Va. 2009) (Ellis, J.); <u>see also</u> 8 U.S.C. § 1421(c). In reviewing denials of naturalization applications, therefore, courts are not required to uphold or defer to the administrative findings of the BIA or the Immigration Courts. <u>Id.</u>; <u>see also</u> <u>Hovsepian</u>, 359 F.3d at 1162 (holding that "even if the INS is allowed to make the initial decision on a naturalization application, the district court has the final word and does not defer to any of the INS's

40

findings or conclusions").

Nesari has not cited any legal authority wherein a finding of the BIA or an immigration judge regarding removability was found to bind a federal court or to preclude that court from reaching a different result on a later petition for review of the denial of a naturalization application.  In fact, all of the cases cited by Nesari in support of his argument that federal courts must afford deference to administrative findings in this context are wholly inapposite.  For example, Gao v. Holder, 595 F.3d 549 (4th Cir. 2010), holds only that the factual determinations of the BIA must be afforded deference when federal courts review the determinations of *asylum* and *removal* proceedings pursuant to 8 U.S.C. § 1252, a statutory provision that does not provide for de novo review.  The same is true for Camara v. Ashcroft, 378 F.3d 361 (4th Cir. 2004), Gandziami v. Gonzales, 445 F.3d 351 (4th Cir. 2006), and Dankam v. Gonzales, 495 F.3d 113 (4th Cir. 2007), all of which also relate to the appropriate standards of review for appeals of asylum and removal determinations.  Those cases thus have no bearing on the instant action, in which Nesari seeks review of the denial of his *naturalization* application under 8 U.S.C. § 1421(c).[9]

---

[9]  Nesari also cites 8 C.F.R. § 1003.1(d)(3), purportedly in support of the proposition that the factual determinations of the IJ or the BIA control in the context of this Court's judicial review of naturalization denials under 8 U.S.C. § 1421(c), unless clearly erroneous.  See Pet'r's Opp. at 2.  However, 8 C.F.R. § 1003.1(d)(3)(i) simply provides that "[t]he Board [of Immigration Appeals] will not engage in de novo review of

41

Nesari also attempts to invoke various preclusion doctrines, including res judicata and collateral estoppel, arguing that the findings of the IJ and the BIA in the prior removal proceedings against him should have preclusive effect on the USCIS's decision to deny his naturalization application and on this Court's de novo review pursuant to 8 U.S.C. § 1421(c). In other words, Nesari argues that (a) the question of whether he was lawfully admitted on a K-1 fiancé visa has already been determined by the Immigration Court and the BIA, and therefore (b) the USCIS and this Court are bound by those findings and determinations. See Pet'r's Opp. at 6.

Once again, however, that argument is incorrect, as it rests on a fundamental misunderstanding of the laws governing naturalization and removal. Specifically, Congress has explicitly stated that the findings of the BIA or an IJ in terminating *removal proceedings* do not have any effect whatsoever on the question of whether the USCIS should *naturalize* a person:

> [T]he findings of the Attorney General in terminating removal proceedings or in cancelling the removal of an alien pursuant to the provisions of this chapter, <u>shall not be deemed binding on any way</u> upon the

---

findings of fact determined by an immigration judge. Facts determined by the immigration judge, including findings as to the credibility of testimony, shall be reviewed only to determine whether the findings of the immigration judge are clearly erroneous." In other words, 8 C.F.R. § 1003.1(d)(3) sets out *internal* review standards for the BIA, but it has no bearing on a district court's statutorily-conferred responsibility to conduct <u>de novo</u> review in the context of a naturalization proceeding. In fact, it has absolutely no bearing on a district court's form of review at all.

> Attorney General with respect to the question of
> whether such person has established his eligibility
> for naturalization as required by this subchapter.

8 U.S.C. § 1429 (emphasis added).  Indeed, as the BIA itself has

admitted, "neither the Board [BIA] nor the Immigration Judges have

jurisdiction to determine an alien's eligibility for

naturalization."  In re Hildago, 24 I. & N. Dec. 103, 105-06 (BIA

2007); see also Mobin, 598 F. Supp. 2d at 780-81; Application of

Martini, 184 F. Supp. 395, 399 (S.D.N.Y. 1960) (holding that

naturalization and removal are entirely different matters, and

that "[p]resence in the United States, lawful or unlawful, does

not affect the right to naturalization").  Accordingly, under the

plain language of 8 U.S.C. § 1429, the BIA and IJ's resolution of

Nesari's removal proceedings in his favor has no claim preclusive

or issue preclusive effect on the USCIS's decision regarding his

eligibility for naturalization, nor on this Court's de novo review

of that naturalization decision pursuant to 8 U.S.C. § 1421(c).

     Ultimately, for all the reasons explained above, this Court

is simply not bound by the findings of either the IJ or the BIA

during the prior removal proceedings, and must instead conduct its

own de novo review and reach its own conclusions.  See 8 U.S.C.

§ 1429 (making clear that the findings of the BIA and Immigration

Courts are not binding in any way in adjudications of

naturalization applications); 8 U.S.C. § 1421(c) (providing for de

novo review by the district courts of USCIS decisions regarding

naturalization).  Indeed, to hold otherwise, and to find this

Court bound in naturalization proceedings to findings of fact or conclusions of law made by the BIA during separate and distinct removal proceedings, would be "to ignore the fundamental and essential difference between removal and naturalization." See Mobin, 598 F. Supp. 2d at 784-85. This Court will therefore proceed to conduct its own analysis of the lawfulness of Nesari's admission to the United States.

### c.  Invalidity of Nesari's K-1 Fiancé Visa

The Court's de novo review of the administrative record compels the conclusion that Nesari is not entitled to naturalization because he was not lawfully admitted to the United States for permanent residence, as is required by 8 U.S.C. § 1429; instead, Nesari was statutorily ineligible to receive the K-1 fiancé visa that he used to enter the United States in August 1996.  That conclusion rests on the straightforward application of 8 U.S.C. § 1184(d)(1) and 8 C.F.R. § 214.2(k)(2), which set forth the requirements for the issuance of a proper visa to a fiancé of a United States citizen.  Under those statutory and regulatory provisions, the issuance of an I-129F alien fiancé petition is precluded if the petitioner and the potential K-1 beneficiary have not met in person within the two years immediately preceding the filing of the petition, and if they do not qualify for an exemption from that meeting requirement pursuant to 8 C.F.R. § 214.2.

Here, it is undisputed that Nesari and Eastin did not meet in person at any time within the two years immediately preceding the filing of their I-129F Petition. See Pl.'s Compl. ¶ 20; see also A.R. at 300, 394; id. at 871-72, 1874-75 (statement from Eastin, indicating: "I was introduced to Bahman [Nesari] one week before the marriage. . . . I was informed by Joe [Nesari] about the fiancé petition and that we would have to meet prior to the marriage . . . [Joe Nesasri] arranged for Bahman [Nesari] and I to meet in Turkey, but I didn't go."). In fact, Eastin and Nesari did not meet in person until approximately two months after Nesari's arrival in the United States. See id. at 3693-94 (220:22 - 221:4). Nesari therefore plainly failed to fulfill the in-person meeting requirement under 8 U.S.C. § 1184(d)(1).

Moreover, Nesari has not met his burden to establish that he qualified for an exemption from the in-person meeting requirement under 8 C.F.R. § 214.2(k)(2). That regulation provides that an alien petitioning for naturalization may be exempt from the in-person meeting requirement "only if it is established that compliance would result in extreme hardship to the petitioner," or "that compliance would violate strict and long-established customs of the K-1 beneficiary's foreign culture or social practice, as where marriages are traditionally arranged by the parents of the contracting parties and the prospective bride and groom are prohibited from meeting subsequent to the arrangement and prior to the wedding day." 8 C.F.R. § 214.2(k)(2). Nesari has never

45

claimed that the "long-established customs" exemption applies here, and courts typically find "extreme hardship" only in cases involving a risk of physical injury, or some other unique or unusual hardship. <u>See</u> <u>Hassan v. INS</u>, 927 F.2d 465, 468 (9th Cir. 1991) (holding that "[e]xtreme hardship will not be found absent a showing of significant actual or potential injury"); <u>see also</u> <u>Hernandez-Cordero v. INS</u>, 819 F.2d 558, 564 (5th Cir. 1987) (explaining that in the deportation context, "extreme hardship" rests on a showing of "unique" or "unusually severe" hardship).

In this case, the government never granted Nesari an official exemption from the in-person meeting requirement, nor does it appear that Nesari ever formally requested such an exemption. <u>See</u> A.R. at 300-29. Moreover, although Nesari argues that he must have been granted an implicit exemption or waiver because his K-1 fiancé visa was eventually approved, such implicit waivers are not granted by immigration officials. Instead, when a waiver of the meeting requirement is granted, it is explicitly noted on the I-129F Petition itself. <u>See</u> Reply Mem. of Law in Supp. of Defs.' Mot. for Summ. J. [Dkt. No. 58] at Ex. 1 (Zeppi Decl.) (explaining that when "USCIS determines to grant the exemption, and [a] waiver of the requirements under 8 C.F.R. § 214.2(k)(2), [it] is always acknowledged by the officer with an explicit annotation on the Form I-129F Petition in the 'Remarks' section in the top box labeled 'DO NOT WRITE IN THIS BLOCK'"). No such notation was provided on Nesari's petition, and it therefore appears that no

46

waiver of the meeting requirement was granted. See A.R. at 300.

In any event, even if the government effectively or inadvertently waived the in-person meeting requirement for Nesari and Eastin, Nesari's K-1 fiancé visa itself, along with any accompanying waivers, was void ab initio if it was issued in error and did not comply with the governing statutory and regulatory requirements. See, e.g., De La Rosa, 489 F.3d at 554-55 (explaining that even if an alien has been granted an adjustment of immigration status, if the alien is subsequently determined in an immigration proceeding to have originally been ineligible for that status, that alien has not been "lawfully admitted for permanent residence" because "the alien is deemed, ab initio, never to have obtained lawful permanent resident status"); Matter of Longstaff, 716 F.2d at 1441 (holding that because the plaintiff was excludable under the INA at the time he was granted an immigrant visa by mistake, he had not been "lawfully admitted" to the United States, and was therefore ineligible for naturalization); Lai Haw Wong v. INS, 474 F.2d 739, 741-42 (9th Cir. 1973) (holding that when a visa was issued in error, "[s]uch mistaken admission conferred no status, permanent or otherwise, on [the petitioners] . . . [because] [n]one was lawfully admitted"); see also Savoury v. U.S. Att'y Gen., 449 F.3d 1307, 1317 (11th Cir. 2006); Arellano-Garcia v. Gonzales, 429 F.3d 1183, 1187 (8th Cir. 2005).

Here, there does not appear to be any valid basis upon which a waiver of the in-person meeting requirement, either explicit or implicit, could have been granted. Rather, in her I-129F Petition, Eastin originally indicated that she had not yet met Nesari in person because it was dangerous for her to travel to Iran, and because Nesari had military obligations until on or around February 7, 1996. <u>See</u> A.R. at 313. However, in response to INS's queries regarding why she and Nesari had not met in a third country after February 7, 1996, Eastin simply made a vague and unsatisfactory allusion to "passport and other related arrangements that [Nesari] had to make." <u>Id.</u> at 314. Such bureaucratic and administrative difficulties plainly do not meet the requirement of the "long-established customs" exemption, nor do they demonstrate that meeting in person would result in "extreme hardship" to either Eastin or Nesari, as required by 8 C.F.R. § 214.2(k)(2).

Notably, in fact, far from establishing the foundation for any "extreme hardship" waiver of the in-person meeting requirement, Eastin did not even attempt to claim that she was entitled to such an exemption. Rather, she stated just the opposite: that she and Nesari *could*, and in fact *would*, comply with the meeting requirement by traveling to Turkey in July 1996 to meet each other. <u>Id.</u> (responses from Eastin, stating that "July is the earliest possible time for us to meet in a third country" and "[e]nclosed please find a copy of my ticket for

48

departing the U.S. to travel to Turkey in July 1996 in order to meet my fiancé. . . . Upon my return requested documents will be submitted to your office.").  Nesari's and Eastin's own conduct thus demonstrates their understanding that, contrary to Nesari's current claims, the couple had not qualified for any waiver of the in-person meeting requirement.  Their failure to follow through on their plans to meet each other before Nesari entered the United States therefore undermines the validity of Nesari's K-1 visa.

     To be sure, the fact that the immigration authorities had already approved Eastin and Nesari's I-129F Petition may have contributed to their decision not to meet each other in a third country before Nesari entered the United States.  Nesari therefore argues that equitable considerations, including the doctrine of equitable estoppel, preclude defendants from arguing that he is now ineligible for naturalization.  <u>See, e.g.</u>, Pet'r's Opp. at 10, 13.

     Unfortunately, however, because this case involves naturalization, Nesari's invocation of such equitable doctrines is misplaced.  The INA provides that "[a] person may only be naturalized as a citizen of the United States in the manner and under the conditions prescribed in this subchapter, and not otherwise."  8 U.S.C. § 1421(d) (establishing the "sole procedure" for naturalization).  Based on that clear statutory directive, the Supreme Court has held that the power to make someone a citizen of the United States has not been conferred upon the federal courts,

like mandamus or injunction, as one of their generally applicable
equitable powers. See Pangilinan, 486 U.S. at 883-84 (citing 28
U.S.C. §§ 1361 and 1651). Rather, it has been given to them as a
specific function to be performed in strict compliance with the
terms of 8 U.S.C. § 1421(d) and all other authorizing statutes.
Id.; see also Fedorenko, 449 U.S. at 506 ("[T]here must be strict
compliance with all the congressionally imposed prerequisites to
the acquisition of citizenship.").

　　　As such, aliens like Nesari "must possess the qualifications
prescribed by the statutes" to be entitled to naturalization.
Estrin v. United States, 80 F.2d 105, 105 (2d Cir. 1935). If they
do not, this Court is powerless to award any equitable relief
conferring citizenship upon them, regardless of how compelling
their excuses for non-compliance may be. In this case, it is
unclear whether Nesari and Eastin did not meet in person in Turkey
before Nesari's entry because of the government's mistaken
approval of the I-129F Petition, because they did not actually
have any bona fide relationship with one another, or for some
other reason entirely. Ultimately, however, the reasons are
irrelevant. The simple fact is that Nesari and Eastin did not
meet in person, nor did they obtain a waiver of the meeting
requirement, and Nesari therefore does not "possess the
qualifications prescribed" to become a naturalized United States
citizen. Estrin, 80 F.2d at 105.

In the final analysis, the interrelation of the substantive requirements for lawful admission to the United States and the facts in this administrative record yields only one possible conclusion: the INS approved Eastin and Nesari's fiancé petition in error on June 5, 1996, and the resulting K-1 fiancé visa is a legally nullity.  That fact is as unfortunate as it is embarrassing.  Quite frankly, this Court expects better of our federal government.  Nonetheless, the simple fact remains that because Nesari's entrance into the United States on his K-1 visa was not granted "in accordance with the immigration laws," as mandated by the applicable statutes and regulations, he is ineligible for naturalization as a matter of law.  See 8 U.S.C. § 1101(a)(20); see also 8 U.S.C. § 1184(d)(1); 8 C.F.R. § 214.2(k)(2).  Indeed, Nesari's failure to comply with the meeting requirements of 8 U.S.C. § 1184(d)(1) rendered him excludable under the INA at the very moment of his entrance.  Under these circumstances, Nesari is plainly not entitled to become a naturalized United States citizen.

### IV.  Conclusion

Under 8 C.F.R. § 214.2(k)(2), a "[f]ailure to establish that the petitioner and K-1 beneficiary have met within the required period or that compliance with the requirement should be waived shall result in the denial of the [admission] petition."  Id.  That language begins and ends our inquiry.  Without an in-person meeting between the engaged couple or a valid waiver of that

51

meeting requirement, there can be no lawful admission of a K-1 fiancé.  And without such lawful admission, there can be no entitlement to naturalization.

For all these reasons, petitioner cannot meet his burden on his "Petition for Review of Denial of Application for Naturalization Pursuant to 8 U.S.C. § 1421(c) and Request for De Novo Hearing."  Accordingly, defendants' Motion for Summary Judgment [Dkt. No. 41] will be granted, Nesari's Cross-Motion for Summary Judgment [Dkt. No. 59] and his Motion for Voluntary Dismissal [Dkt. No. 66] will be denied, and judgment will be entered in favor of the defendants by an Order to be issued with this Memorandum Opinion.

Entered this _11th_ day of August, 2011.


Alexandria, Virginia

                                        /s/
                              _____
                              Leonie M. Brinkema
                              United States District Judge